IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

TECH USA, INC.                                    *
8334 Veterans Highway
Millersville, MD  21108,                          *
a Maryland Corporation
                                                  *  Civil No. _____
        Plaintiff
                                                  *
    v.
                                                  *
KEVIN S. CRABTREE
529 Cypress View Drive                            *
Oldsmar, FL 34677
                                                  *
        Defendant
*     *     *     *     *     *     *     *

## TECH USA's MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

Plaintiff, TECH USA, Inc. ("TECH USA"), in accordance with Rule 65 of the Federal

Rules of Civil Procedure, and paragraph 5 of the Confidentiality/Non-Competition Agreement

(Overhead Employees) ("Agreement") between the parties (Exhibit A to the Verified

Complaint), respectfully submits this Memorandum of Law in support of its Motion for

Preliminary Injunctive Relief against Defendant, former TECH USA employee Kevin Crabtree

("Crabtree").  TECH USA incorporates by reference herein the sworn statement of facts

contained in its Verified Complaint and the Exhibits attached to the Verified Complaint,

including but not limited to the Affidavit of TECH USA Chief Executive Officer and founder

Thomas. B. Howell (Exhibit B to the Verified Complaint) ("Howell Aff'd"), and the Affidavit

of John P. Michaud (Exhibit D to the Verified Complaint) ("Michaud Aff'd").

## I.    THE FACTS AND THE RELIEF SOUGHT

TECH USA is a small to mid-size competitor in the nationwide market for providing customized staffing and consulting support to commercial and government clients.  It has expertise particularly in the areas of engineering, information technology, aerospace, scientific and professional services.  Its competitors include companies with revenues of many hundreds of millions of dollars or more.  TECH USA develops close working relationships with its corporate and other customers in order better to understand and service their personnel and hiring needs, whether via contract assignments of TECH USA personnel to the customer's (or its end-client's) projects and/or by means of finding, screening and referring direct placements of new employees to join the customer's payroll.  (Verified Complaint, hereinafter "VC", ¶ 2).

On or about June 7, 1999, at the inception of his employment with Plaintiff, Crabtree and TECH USA, as employer, entered into the Agreement.  That Agreement protects TECH USA's trade secrets (¶¶ 1-2), and also required Crabtree to refrain from soliciting TECH USA customers and from otherwise competing with TECH USA for a limited period of time in a limited geographic area after leaving its employ.  (Id., ¶¶ 3(b), 4(a), 4(b)).

Crabtree's position as an entry-level recruiter with Plaintiff, beginning in mid-1999, was Defendant's first job after college.  He worked in Plaintiff's Millersville, Maryland office from June 1999 until approximately early 2001, at which time he relocated to Tampa, Florida and worked at Plaintiff's office in Tampa, Florida until his abrupt resignation on January 12, 2007 (VC, ¶¶ 4-5).

TECH USA provided extensive specialized training to Crabtree regarding recruiting and sales in the staffing industry during the more than 7 1/2 years of his employment with

TECH USA.  He received substantial confidential trade secret information from TECH USA, including without limitation customer names, hiring manager contact information (including but not limited to email addresses and direct dial telephone numbers), customer preferences on preferred staffing solutions, and customers' pricing margins, that TECH USA had developed over years with substantial effort and expense, that it has reasonably safeguarded, that was not public information, that was not readily available to its competitors, that would be very valuable to its competitors, and that would take them substantial time and expense to ascertain (VC, ¶ 6).

As recited in detail in the Verified Complaint, in violation of the Maryland Uniform Trade Secrets Act, and his Agreement (¶ 1), Crabtree misappropriated TECH USA's confidential information about customer contacts, preferences, pricing and histories of dealing, including customer(s) with whom he had dealt as an account executive in Florida for TECH USA, an example of which was Cavoli Engineering.  In violation of another obligation (Agreement, ¶ 2), he has never returned certain company property and other information despite written demand by TECH USA that he do so (VC ¶¶ 11-13).

Shortly after he resigned from TECH USA, allegedly for reasons of health (VC ¶ 10), Crabtree also began to violate his other major post-termination obligations in his Agreement with TECH USA, notably that, for one year after termination, (a) he not solicit TECH USA customers and (b) he not compete with TECH USA in its business within fifty (50) miles of any TECH USA office.  TECH USA learned in late April or early May 2007 of his most blatant violation, placing John Michaud with TECH USA customer Cavoli Engineering, a company with which Crabtree had dealt shortly before his resignation from TECH USA.  (VC

¶¶ 14-27 and Exhibit A thereto Howell Aff'd, ¶¶ 3(b), 4(a) and 4(b); See also Exhibit D thereto, Michaud Aff'd ¶¶ 3-7).  Crabtree involved and operated under the guise of his wife's company, Inergy Professionals, Inc. seeking to conceal these violations of law, used a false name and false company identification in that effort, and actively sought to induce Mr. Michaud to conceal Crabtree's violations. (VC ¶¶ 14-23; Michaud Aff'd ¶¶ 3, 5 and 11).

In sum, Crabtree has violated several provisions of his Agreement, violated statutes (the Lanham Act and Maryland Uniform Trade Secrets Act) and committed common law unfair competition.  While he owes substantial damages, exemplary damages, and attorney's fees to TECH USA, a significant portion of his violations cannot be fully compensated for in damages.  They are irreparable and require equitable relief. (VC, Counts I-VII).

In this Memorandum, we set forth the principal grounds upon which preliminary injunctive relief is appropriate here:  the non-solicitation and non-competition covenants and the trade secret obligations.  Injunctive relief is authorized under <u>any</u> or <u>all</u> of these three independent grounds.

## II.   <u>LEGAL ARGUMENT</u>

### A.   <u>The Applicable Legal Standard</u>

This Court is familiar with the standards that govern requests for preliminary and permanent injunctive relief.

The legal standard applicable to TECH USA's motion for a preliminary injunction was articulated by Judge Young in *Merry Maids LLP v. Kamara*, 33 F. Supp.2d 443 (D. Md. 1998), granting a franchisor a preliminary injunction that enforced a one year, 75-mile radius

4

non-competition covenant against a terminated maid service franchisee, as well as the

franchisor's Lanham Act rights:

The Fourth Circuit, in evaluating preliminary injunction claims, follows the balance-of-

hardship test set forth in *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir.

1977). The four factors to consider are:

> 1. the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied;
> 2. the likelihood of harm to the defendant if the requested relief is granted;
> 3. the likelihood that the plaintiff will succeed on the merits; and
> 4. the public interest.

Id. at 445.[1] This "hardship balancing test" determines "the degree by which a 'likelihood of

success' on the merits must be established before relief may issue." *Direx, Inc. v.*

*Breakthrough Medical, Corp.*, 952 F.2d 802, 811 (4th Cir. 1992). As the balance of harms tips

toward Plaintiff, a lesser showing of likelihood of success on the merits is required. *Rum*

*Creek Coal Sales, Inc. v. Caperton,* 926 F.2d 353, 359 (4th Cir. 1991). See also, *Kowalski v.*

*Chicago Tribune Co.,* 854 F.2d 168, 170 (7th Cir. 1988) ("A request for a preliminary

injunction is evaluated in accordance with a 'sliding scale' approach: the more the balance of

irreparable harm inclines in Plaintiff's favor, the smaller the likelihood of prevailing on the

merits he need show in order to get the injunction"). As the Fourth Circuit pointed out in

*Ancora Capital & Management Group, LLC v. Gray*, 55 Fed. App. 111, 114 (4th Cir. 2003),

in reversing the District Court's refusal to enjoin a former employee who violated two year

non-competition obligations covering a wide geographic area, the threshold for the ex-

employer is not high. Citing *Direx*, supra, the Court stated:

---

[1] Plaintiff's counsel was counsel for Merry Maids in that case.

> This Court has held that when the balance of harms "tips decidedly in favor of the plaintiff, a preliminary injunction will be granted if the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation."

As demonstrated below, TECH USA does not need the benefit of the reduced threshold, because each of the four factors weighs heavily in favor of TECH USA's Motion for a Preliminary Injunction.

### B.   TECH USA Is Entitled To An Order Enjoining Defendant's Breach of the Contractual Covenants Not To Solicit and Not To Compete

#### 1.   The Covenants

Paragraphs 3(b), 4(a) and 4(b) of the Agreement provide, among other things, that, upon termination of the Agreement and for a period of one (1) year thereafter, the ex-employee Crabtree not solicit TECH USA's customers, and not compete with TECH USA within fifty (50) miles of a TECH USA office (VC, Exhibit A).

#### 2.   TECH USA Will Be Irreparably Harmed Absent the Enforcement of the Covenant Not to Solicit and Covenant Not to Compete

##### a.   Post-Term Covenants in Maryland Employment Cases

Maryland law[2] recognizes two types of post-term covenants not to compete in employment contracts:

> (1)   Agreements to Protect Against Solicitation of or Doing Business With the Former

---

[2] The Agreement (¶ 7) contains a clause stating that it will be governed by and construed in accordance with Maryland law. Courts routinely uphold such choice of law provisions in contractual agreements. See *Nantahala Village, Inc. v. NCNB National Bank of Florida*, 976 F.2d 876, 880-81 (4th Cir. 1992); *Kaplan v. RCA Corp.*, 783 F.2d 463, 465 (4th Cir. 1986); *Eisaman v. Cinema Grill Systems, Inc.*, 87 F. Supp. 2d 446, 448-49 (D. Md. 1999); *Gilman v. Wheat, First Securities, Inc.*, 345 Md. 361, 370-382, 692 A.2d 454, 459-463 (1997); *National Glass Inc. v. J.C. Penney Properties, Inc.*, 336 Md. 606, 610-12, 650 A.2d 246, 248-49 (1994).

Employer's Customers or from Competing
in a Designated Territory

(2)    Agreements to Protect Trade Secrets

See *Tabs Associates, Inc. v. Brohawn*, 59 Md. App. 330, 475 A.2d 1203 (1984).  Except

where the violation involves trade secrets, the agreement's validity depends on balancing the

employer's need to protect his or her business versus the hardship imposed on the employee by

restricting his or her ability to compete.  By contrast, trade secrets have always been protected,

even apart from any agreement or covenant.  *Head Ski Co. v. Kam Ski Co.,* 158 F. Supp. 919,

923 (D. Md. 1958); *Space Aero Products Co. v. R.E. Darling Co.,* 238 Md. 93, 208 A.2d 74,

cert. denied, 382 U.S. 843 (1965).  Maryland now protects trade secrets by statute under the

Maryland Uniform Trade Secrets Act, Maryland Comm. Law Code Ann. § 11-1201 et seq.

(1990) (the "MUTSA").  Here, Crabtree will be enjoined if he has violated his trade secret

obligations, and will be enjoined if either of the two covenants (non-solicitation and non-

compete) is lawful.  In fact, he has violated his trade secret obligations, and both covenants are

lawful.  Hence, he is subject to a three part injunction.

### b.    The Adequacy of Consideration

The post-term covenants here are supported by adequate consideration.  *Simko Inc. v.*

*Graymar Co.,* 55 Md. App. 561, 464 A.2d 1104 (1983) (employment or continued

employment of even an at-will employee for a substantial period of time after the employee

enters into the covenant is sufficient consideration for the covenant.)  Crabtree was employed

by TECH USA for over seven years, and he resigned.

### c.    The Balancing Test Applicable in Enforceability of the Covenants

7

The enforceability of a covenant not to compete "depends on the facts of a given case."

*Millward v. Gerstung International Sports Education, Inc.* 268 Md. 483, 488, 302 A.2d 14

(1973); *Ruhl v. F.A. Bartlett Tree Expert & Co.*, 245 Md. 118, 225 A.2d 288 (1967). As the

Court of Appeals held in *Holloway v. Faw, Casson & Co.*, 319 Md. 324, 572 A.2d 510

(1990), aff'g in pertinent part, 78 Md. App. 205, 552 A.2d 1311 (1989), the general rule:

> "is that 'restrictive covenants in a contact of employment,
> by which an employee as part of his agreement undertakes
> not to engage in a competing business or vocation with that
> of his employer or in leaving the employment, will be
> sustained' if the restraint is confined within limits which are
> no wider as to area and duration than are reasonably
> necessary for the protection of the business of the employer
> and do not impose undue hardship on the employee or
> disregard the interests of the public."
>
> *Ruhl*, 245 Md. At 123-24. . . . (quoting *MacIntosh v.
> Brunswick Corp.*, 241 Md. At 31, 215 A.2d at 225
> (1965). . . .

Id. at 334-35. See *Deutsche Post Global Mail Ltd. v. Gerard Conrad*, 292 F. Supp. 2d 748

(D. Md. 2003) (Motz, J.), aff'd 116 Fed. Appx. 435, 2004 U.S. App. Lexis 24249 (4th Cir.

2004); *Padco Advisors, Inc. v. Omdahl*, 179 F. Supp. 2d 600 (D. Md. 2002) (Chasanow, J.);

*Intelus Corp. v. Barton*, 7 F. Supp. 2d 635 (D. Md. 1998) (Williams, J.).

### d.    TECH USA has Several Protectable Interests

In order for a non-competition covenant to be enforced, TECH USA must have at least

one of several protectable interests. In fact, it has several. Enforcement will be permitted if

the employee provides unique services, or if the covenant prevents future misuse of trade

secrets, or if the covenant prevents misuse of client lists, or if the covenant prevents

solicitation of customers. *Becker* v. *Bailey,* 268 Md. 93, 97, 299 A.2d 771 (1973); *Holloway,*

78 Md. at 214. *Fowler v. Printers II, Inc.,* 89 Md. App. 448, 598 A.2d 794 (1991); *Allan M Dworkin D.D.S, PA., v. Blumenthal,* 77 Md. App. 774,551 A.2d 947 (1989).  As in the present case, preventing an employee from "pirat[ing] the employer's customers" is a significant protectable interest.  *Holloway,* 319 Md. at 335.

### e.    The Duration of the Covenants is Reasonable

The temporal limit on competition must be reasonably necessary to protect the legitimate business interests of the employer, without imposing an undue hardship on the employee, and the focus is on the scope of the particular covenant itself.  If it is not too broad on its face, then the facts and circumstances of each case will be examined.

The covenants here are for one year from termination of employment (or, where the employee violates the covenants, one year from a Court order enforcing them.)  Maryland has consistently upheld two year non-competition covenants in employment cases. See e.g., *Padco Advisors, Inc. v. Omdahl,* 179 F. Supp. 2d 600 (D. Md. 2002); *Millward,* 268 Md. at 489 (director of sports camp; actually, a covenant was enforced which provided that the employee would never solicit the employer's customers, although that issue was not before the court); *Gill* v. *Computer Equipment Corp.,* 266 Md. 170, 292 A.2d 54 (1972) (manufacturer's representative); *Tuttle v. Riggs-Warfield-Roloson, Inc.,* 251 Md. 45, 246 A.2d 588 (1968) (insurance agent with duties to service existing accounts and develop new business); *Ruhl,* 245 Md. at 118 (enforcing a two year covenant prohibiting a tree care company area manager from competing for customers and potential customers within a broad geographic territory).  TECH USA CEO and founder Howell affirms in his Affidavit (Exh. B to the Verified Complaint) why at least one year is reasonable here.  First, it takes from 6 months to 18 months to secure a

9

new customer (Howell Aff'd ¶ 4).  If the TECH USA salesperson handling the account leaves

the company's employ, there needs to be a "cooling off" or "lock-out" period in which the

former salesperson refrains from soliciting TECH USA's customer and/or competing in the

market area, thereby allowing for the training of a new salesperson to replace the former

employee and for the orderly transition to the replacement salesperson of TECH USA accounts

that the former salesperson serviced during his employment.  Id.  Like many of its

competitors, twelve months is the reasonable "cooling off" or "lock-out" period that TECH

USA has selected, although some competitors use a longer period.  Id.

By contrast, trade secrets are independently protectable, without limit -- i.e., as long as

they qualify as trade secrets.  MUTSA, § 11-1202(b) (injunction terminates when the "trade

secret has ceased to exist", but it may be "continued for an additional reasonable period of time

in order to eliminate commercial advantage that otherwise would be derived from the

misappropriation."); see also *Head Ski*, supra.

### f.    The Scope of the Restraints is Reasonable

#### (i)    Covenant Limited by Territory

TECH USA CEO and founder Howell as explains in his Affidavit why the radius

restriction chosen by TECH USA is reasonable and necessary for its protection.  The 50-mile

radius restriction for the non-compete reflects the typical size of a large metropolitan area in

the United States, although TECH USA operates in many geographically larger markets such

as Northern Virginia/Washington, D.C., Atlanta, Orlando, Tampa, Dallas, Phoenix/Tempe,

Baltimore/Central Pennsylvania (I-83 and I-97 corridors), and Philadelphia/Southern New

Jersey where a radius of 75 or even 100 miles might be appropriate.  Howell Aff'd at ¶ 7.

Nevertheless, Mr. Howell has directed that the geographic radius be drawn at 50 miles in order to strike a reasonable balance of protecting the company's interests vis-à-vis the employees. Many aspects of the current case indicate the reasonableness of the 50-mile radius: TECH USA's customer Cavoli Engineering of Sarasota, Florida has done business with TECH USA's Tampa office, even though that office is in the vicinity of 50 miles from Cavoli's Sarasota office. Id. The candidate John P. Michaud had decided to engage Defendant Crabtree in Mr. Michaud's job search, although Mr. Michaud's home is located in the vicinity of 50 miles from Defendant's home from which Crabtree apparently engaged in the staffing business. Id.

The 50-mile radius is drawn from any TECH USA office because many of the company's customers are serviced from a number of different offices, particularly the larger corporate accounts. Moreover, at TECH USA's national conferences, senior sales executives, such as Defendant Crabtree, have the opportunity to meet, and do meet and converse in detail with, various TECH USA employees from other offices. Id. If there were no 50-mile restriction from each TECH USA office, then a former employee such as Crabtree would be free to relocate right next to another TECH USA office and attempt to compete directly with that office by soliciting many of the larger TECH USA customers while attempting to recruit TECH USA employees he had met at national conferences to work with or for him in the vicinity of that other office. Id.

To reiterate, the issue is whether the restriction is "no wider" than "reasonably necessary for the protection of the business of the employer." *Silver v. Goldberger,* 231 Md. 1, 6, 188 A.2d 155 (1963); see *Holloway,* 319 Md. at 348-49. *Ruhl,* 245 Md. at 128-29 (the

11

court enforced a full five county restrictive covenant covering a greater distance than the radius restriction here, because the restriction had a valid relationship to the business activity of the employer, and even though it was not limited solely to the customers specifically served by the employee himself). Indeed, even nationwide covenants have been upheld by this Court where, as here, the ex-employee has substantial opportunities for alternate employment, *Intelus Corp. v. Barton,* 7 F. Supp. 2d 635 (D. Md. 1998). See also Howell Aff'd at ¶ 12 ("I have known Defendant Crabtree for more than seven years, and he is capable of obtaining sales employment in any number of industries outside the staffing industry, or he is free to continue working with another staffing company outside the 50-mile radius of the TECH USA non-compete restriction, as long as he complies with the remaining provisions of the Confidentiality/Non-Competition Agreement he signed with TECH USA.")

### (ii)     Non-Area Restriction Limited to Customers of the Employer

Maryland cases have held that a restriction on soliciting all customers of the employer is enforceable even if there is no geographic area designated. See G*ill v. Computer Equipment Corp.*, 266 Md. 170, 180, 292 A.2d 54 (1972); *Tuttle v. Riggs, Warfield-Roloson, Inc.,* 251 Md. 45, 47 246 A.2d 588 (1966).

This Court has ruled recently that restrictions barring solicitations of and contacts with all clients of the employer are proper. *Padco Advisors Inc. v. Omdahl*, 179 F. Supp. 2d 600 (D. Md. 2002). Similarly, as this Court held in 2003 in *Deutsche Post*, "a mere prohibition on solicitation of customers . . . is commonly found in restrictive covenants. . . ." 292 F. Supp. 2d at 756. Affirming that decision, the Fourth Circuit held "[e]mployers have a legally protected interest in preventing departing employees from taking with them [customer

goodwill]", 116 Fed. Appx. at 438.

(iii)    Covenants Protecting Trade Secrets

As stated above, a covenant not to compete protecting trade secrets is independently enforceable and, where the employer can show its customer information--or any material part of that information--is protected information under the MUTSA, the employee will perforce be enjoined from using that customer information. MUTSA, § 11-1202, "Misappropriation of trade secrets may be enjoined."

Accordingly, even apart from one year non-solicitation and one-year non-competition radius clauses in the Agreement, Crabtree's acts are unlawful because he used trade secret customer information of TECH USA. Mr. Howell's Affidavit explains why the customer information, concerning company contacts, preferences, and pricing, are trade secrets, which were developed at great cost over substantial time by TECH USA, would be unavailable to competitors without comparable effort and expense, would be very valuable to them, and are protected within TECH USA on a need-to-know basis, as well as by the Agreement itself (¶¶ 1-2) (Howell Aff'd ¶ 5). See *NaturalLawn of America, Inc. v. West Group*, 2007 U.S. Dist. Lexis 29774 (D. Md. 2007) at * 11-12 (Davis, J.), citing *Home Paramount Pest Control Co., Inc. v. FMC Corp*. 107 F. Supp. 2d 684 (D. Md. 2000) (customer information is a trade secret).

**g.     If Defendant is not Enjoined, TECH USA Will Suffer
Irreparable Harm and the Balance of Hardships Tips
Decidedly in its Favor**

All of the cases cited in which restrictive covenants have been upheld are injunction cases, where the Courts recognized the ex-employee's alleged harm by reason of being

13

enjoined was far less than the irreparable harm caused to the employer's goodwill if the ex-employee were not enjoined. See, e.g., *Acora Capital*, 55 Fed. Appx. At 114. Indeed, where the employee, like Crabtree, is a young, trained salesman, he has numerous opportunities to find employment, (i) in the myriad of sales jobs available without any restriction, or (ii) even in this same industry, as long as he observes the covenants to which he agreed. See *Intelus Corp. v. Barton*, supra. The harm to him is almost *de minimis*.

As Judge Motz held in *ATL Int'l, Inc. v. Baradar*, Business Fran. Guide (CCH) ¶ 11,345 (D. Md. 1997), in granting a preliminary injunction to a franchisor against a former franchisee who, like Crabtree, had sought to ignore his obligations:

> Of course, [Defendant] is going to suffer harm because I am granting the injunction. He is not going to be able to do this kind of business within [a designated radius] for two years, but that is exactly what he contracted for. I am very sorry, but you enter into a contract, if the contract is reasonable, you are going to have to live with its terms.

Id. at p. 30,335 (emphasis added).[3]

### h.    The Public Interest is Served by Grant of the Injunction

The public interest will be served by granting the requested injunctive relief. "[T]he public has an interest in the enforcement of reasonable restrictive covenants." *Intelus Corp. v. Barton,* 7 F. Supp. 2d at 642. In *Intelus*, referring to a covenant not to compete in an employment contract, Judge Williams held that "[r]estrictive covenants can play an important role in the growth of a business that depends upon the development of goodwill through effective customer service." Id. Further, as Judge Motz stated in *ATL v. Baradar*:

> The public interest I don't really think is an independent factor in this case. Of course, it is unfortunate that Mr.

---

[3]  Plaintiff's counsel was counsel for ATL International, Inc. in that case.

> Baradar will not be able to stay in this line of business [in
> the prohibited Territory] but there are other things that he
> can do.  He can go in this business outside that geographic
> area.  He can go into another business.

Id., at 30,335 (Emphasis added).

In sum, the non-solicitation and non-compete covenants are reasonable and enforceable

by injunction.  And Crabtree has violated the least restrictive covenant -- he solicited and did

business with a company with which he personally had done business recently on behalf of

TECH USA.  See Howell Aff'd ¶ 3, Michaud Aff'd ¶¶ 3, 4 and 6.

### C.  The Injunction Also is Independently Justified Because of Crabtree's Violations of MUTSA and the Trade Secret Provisions of the Agreement

#### 1.  Preliminary Statement Concerning Preemption

The MUTSA, Md. Comm. Law Code Ann ¶ 11-1201 et seq., provides the exclusive

civil remedy for trade secret misappropriation, except for "contractual remedies."  Id, § 11-

1207 (b)(1)(i).  Hence, if there is a trade secret violation by Crabtree--as there is here--it may

be enjoined under the MUTSA § 11-1202, "Misappropriation of trade secrets may be

enjoined" and under normal common law principles for violations of a contractual protection of

trade secrets, See, M.E. Babirak, Jr. "The Maryland Uniform Trade Secrets Act:  A Critical

Summary of the Act and Case Law", 31 U. Balt. L. Rev. 181, 222 & 222 n.362 (2002).

#### 2.  TECH USA's Customer Information Constitutes Trade Secrets

In *NaturalLawn*, this Court cited the definition of "trade secret" under MUTSA:

> Plaintiff also brings a count under the Maryland Uniform
> Trade Secrets Act.  The statute provides, *inter alia*, for an
> award of injunctive relief in response to the
> misappropriation of trade secrets.  Md. Code Ann., Com.
> Law 11-1202(a); see *LeJeune v. Coin Acceptors, Inc.* 381
> Md. 288, 315, 849 A.2d 451 (2004).  The statute defines

> "trade secret" as information that (1) derives independent
> economic value, actual or potential, from not being
> generally known to, and not being readily ascertainable by
> proper means by, other persons who can obtain economic
> value from its disclosure or use; and (2) is the subject of
> efforts that are reasonable under the circumstances to
> maintain its secrecy. Md. Code Ann., Comm. Law 11-
> 1201(e).

2007 U.S. Dist. LEXIS 29774 at ¶ 10 (holding customer information a trade secret). *LeJeune*,

cited by *NaturalLawn*, is the only review of the MUTSA by the Court of Appeals. Writing for

a unanimous court, Judge Battaglia held that the former employer was likely to "succeed on

the merits of its claim of threatened misappropriation" of trade secrets. *LeJeune*, supra, 381

Md. at 315. Relying, however, on the fact that the employee in *LeJeune* (unlike Defendant

Crabtree in the current case) had "never entered into a non-compete or confidentiality

agreement" with the former employer, id. at 295, and finding that the trial court had granted

the preliminary injunction only on the theory of "inevitable disclosure," not recognized in

Maryland, id. at 322-323, the Court vacated the injunction. Id.

In *NaturalLawn*, this Court pointed out that, in addition to the general definition of

trade secret contained in MUTSA, courts also focused on the common law factors defining a

trade secret in the original Restatement of Torts. It explained:

> Defendants also argue that customer lists are not trade
> secrets. But application of the test employed in case law
> contradicts this contention. *Home Paramount Pest
> Control Co., Inc. v. FMC Corp*. 107 F. Supp. 2d 684 (D.
> Md. 2000). In *Home Paramount*, the court noted that
> despite the existence of MUTSA, the six part test of the
> Restatement of Torts has continued to be applied in
> defining trade secrets. Id. at 692 (citing *Bond v.
> Polycycle, Inc*. 127 Md. App. 365, 372-73, 732 A.2d 870
> (1999)). That test requires the court to consider (1) the
> extent to which the information is known outside of [the

16

employer's] business; (2) the extent to which it is known
by employees and others involved in [the employer's]
business; (3) the extent the measures taken by [the
employer] to guard the secrecy of the information; (4) the
value of the information to [the employer] and [the
employer's] competitors, (5) the amount of effort or
money expended by [the employer] in developing the
information; and (6) the ease or difficulty with which the
information could be properly acquired or duplicated by
others. Id. at 693.

It is clear that the identity of NLA's customer is not
widely known outside NLA and that the lists of those
customers *are* well known among NLA employees and
franchisees. Here, the customer lists and how they are
maintained have been carefully guarded. The Franchise
Agreements specifically provided for their return upon the
termination of the franchise relationship. See Franchise
Agreements § 20. These data were so important precisely
because the customer list would be so valuable to a former
franchisee that undertook to became a competitor.

Plaintiff has developed these lists over time. It clearly
takes effort (establishing goodwill) and money
(advertising) to establish any customer base. Therefore,
plaintiff's customer lists are trade secrets. In sum, the
relevant intellectual property, customer lists, and software
belong to NLA and defendants have misappropriated and
made wrongful use of these assets.

2007 U.S. Dist. LEXIS 29774 at * 11-12. Similarly, the Howell Affidavit makes clear that

TECH USA's customer information taken by and used by Crabtree after his termination of his

employment qualifies as Trade Secret information. Thus, Mr. Howell states, in substance:

TECH USA has developed its Trade Secret information over many years with substantial effort

and the expenditure of major amounts of significant time and money; TECH USA's Trade

Secrets are safeguarded by the company in that only sales and recruiting personnel are allowed

to access it via unique user code and password on the company's database - - those Trade

Secrets are not public information, nor are they readily available to TECH USA's competitors. Howell Aff'd ¶5. TECH USA engages in additional safeguarding such as (i) requiring that those employees of TECH USA who access Trade Secrets in order to service TECH USA customers and accounts sign the TECH USA-form Confidentiality/Non-Competition Agreement, which (among other things) explicitly protects TECH USA's Trade Secrets and Confidential Information and requires the return of all TECH USA Company Property at termination of employment, (ii) not providing the Trade Secrets to third parties outside of TECH USA, and (iii) not posting TECH USA customer names or other customer information on the TECH USA website. Id. Moreover, TECH USA's Trade Secrets would be very valuable to its competitors (as Defendant's Crabtree's actions have shown in his pirating the Trade Secrets information about TECH USA's customer Cavoli Engineering), and it would be difficult for a competitor who has not been "inside TECH USA" (as Mr. Crabtree has) to acquire properly or duplicate TECH USA's Trade Secret information. Id.

### 3.     Defendant Misappropriated TECH USA's Trade Secret Information

As recited in *LeJeune*, MUTSA defines misappropriation in Section 11-1201(c) as follows:

> (1)     Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (2)     Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
>> (i)     Used improper means to acquire knowledge of the trade secret; or
>>
>> (ii)     At the time of disclosure or use, knew or had

<u>reason to know that the person's knowledge of the trade secret was:</u>

(1)    Derived from or through a person who had utilized improper means to acquire it;

(2)    <u>Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use</u>; or

(3)    Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

       (iii)    Before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake. . . .

This section describes two general types of misappropriation: (1) acquisition of a trade secret by improper means or (2) disclosure of a trade secret. We must consider this definition in conjunction with the terms of Section 11-1202(a) of MUTSA, which provides an injunction for "actual" or "threatened" misappropriation. A court, therefore, can issue an injunction to prevent either of the following: (1) the actual or threatened acquisition of a trade secret by improper means or (2) the actual or threatened disclosure of a trade secret.

381 Md. at 312.  (Emphasis added.)


Crabtree knew that his post-term use of the trade secrets at issue here was not consented to by TECH USA, and that they had been "acquired under circumstances giving rise to a duty to maintain [their] secrecy . . .", <u>see</u> MUTSA section 11-1201(c)(2)(ii)(2), <u>supra</u>. He knew this because of the Trade Secrets provisions of his Agreement which refer to this information expressly, defining Trade Secrets as including "customer's names, addresses, telephone numbers, contact persons, staffing requirements and/or margin tolerances regarding pricing. . . . ." (Exhibit A to the Complaint, ¶ 1). And he knew this because, immediately

19

after leaving TECH USA's employ, he was reminded of his obligations in writing in this regard by TECH USA counsel (Exhibit C to the Complaint).

In sum, there is no doubt that Crabtree knew he possessed and yet intentionally misappropriated TECH USA's trade secrets. He profited thereby. He attempted to conceal his violations by using a false name and company name, and he engaged Mr. Michaud (unsuccessfully) in concealing his illegal conduct. See Michaud Aff'd ¶¶ 3, 5 and 11.

### 4.    An Injunction Should Issue

MUTSA, recognizing the universal principle that improper disclosure or improper use of a trade secret is irreparable harm and must be prevented or halted by injunction, provides for such injunctions in § 1202, for any "actual or threatened misappropriation." See 31 U. Balt. L. Rev., at 216-17; *NaturalLawn* (granting injunction to prevent use of trade secrets).

### D.    No Bond is Required

A "court may dispense with security altogether if the grant of an injunction carries no risk of monetary loss to the defendant," 11 A. Wright, Miller & Kane, Federal Practice & Procedure, § 2954 at p. 293 (citing eighteen cases); see *Phillips v. Crown Central Petroleum Corp.*, 376 F. Supp. 1250 (D. Md. 1973) (Harvey, J.) (requiring no bond for preliminary injunction). Because the Defendant's violations are so clear, there is no reasonable risk that this Order will be found to have been improvidently granted. Therefore, there is no reasonable possibility that he will suffer monetary loss because of an improvidently issued injunction. Hence, no bond should be required with respect to the Preliminary Injunction. See also *MaggieMoo's International, LLC v. MaggieMoo's of Wilmington*, Civil No. JFM-03-3426 (Order dated December 4, 2003 by Judge Quarles granting preliminary injunction to MMI with

20

no bond required). (Exhibit A hereto).

### IV.     CONCLUSION

Defendant's violations of his post-termination obligations have been widespread, deliberate, and characterized by efforts at concealment and by attempting to enlist innocent person(s) in his illegal scheme.  On any one of several grounds, his conduct should be preliminarily enjoined.

A Preliminary Injunction should be entered, enjoining Defendant, pendente lite, as follows.

1.      Defendant shall not induce, attempt to induce, or assist others to induce or attempt to induce any existing Customer of TECH USA or any prospective Customer with whom TECH USA has had contact, to terminate its business relationship with TECH USA, or do anything, directly or indirectly to interfere with the business relationship, existing or prospective, between TECH USA and (i) any of its Customers (including prospective Customers) or (ii) any other person or any concerns purchasing from or dealing with TECH USA.

2.      Defendant shall not engage in or work for any business or activity which engages in the business of recruiting or providing employees, on a temporary or permanent basis, and which has an office located within fifty (50) miles of any of TECH USA's offices.

3.      Defendant shall not approach, contact, solicit, divert, accept, or contract with any employees or personnel to provide services on a temporary or permanent basis to any individual, corporation, or other entity which at any time within two (2) years prior

to the date of termination of his employment with TECH USA, has been, is, or was a Customer of TECH USA or who was contacted by TECH USA as a potential Customer of customer of the Company.

4.     Defendant shall not disclose or use for his benefit or for that of another party any of TECH USA's Confidential Information and Trade Secrets including without limitation customer names, addresses, telephone numbers, contact persons, staffing requirements and margin tolerances concerning pricing.

Dated:  June 1, 2007

Respectfully submitted,

Allán P. Hillman
U.S. District Court Bar No. 119
**SHIPMAN & GOODWIN LLP**
One Constitution Plaza
Hartford, CT  06103-1919
(860) 251-5000
ahillman@goodwin.com

Grover C. Outland III
U.S. District Court Bar No. 24064
**TECH USA, Inc.**
8334 Veterans Highway
Millersville, MD  21108
outland@techusa.net

Attorneys for Plaintiff

473225 v.01